UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 AUG -7  AM 10: 44

CLERK

BY_____*LAW*_____
COMPLAINT CLERK

2:17-CV-149

CHARLES C. FREIHOFER III,

Plaintiff,

– against –

VERMONT COUNTRY FOODS, INC., NEW ENGLAND COUNTRY
FOODS LLC, and PETER THOMSON, individually and as President
and Director of Vermont Country Foods, Inc. and  Managing Member of
New England Country Foods LLC,

Defendants.

**JURY TRIAL
DEMANDED**

NOW COMES Plaintiff, CHARLES C. FREIHOFER III a/k/a CHRIS FREIHOFER  by and

through his attorneys COOPER ERVING & SAVAGE LLP, complaining of defendants

VERMONT COUNTRY FOODS, INC., NEW ENGLAND COUNTRY FOODS LLC, and

PETER THOMSON, as follows:

### PRELIMINARY STATEMENT

1.      The Plaintiff brings this private and personal federal securities action against

Defendant Vermont Country Foods, Inc ("VCF"), Defendant New England Country Foods, LLC

("NECF") and Defendant Peter Thomson ("Thomson") under § 10(b) of the Securities Exchange

Act of 1934.

2.      Plaintiff owns approximately 96,787.57 shares of VCF common stock with voting

rights.  The Plaintiff came to own such shares as consideration for capital investment in VCF,

and through a conversion of capital loans made  to VCF, later converted to equity in VCF, from

about 1995 through 2001.

3.      Plaintiff asserts two different claims.  The first claim (Count One), asserts fraud under the Securities Exchange Act of 1934 (hereinafter referred to as the "Exchange Act") against those Defendants who are alleged to have directly participated in a continuous fraudulent practice and course of business since VCF's inception and up to the present.

4.      Plaintiff asserts that the Defendants fraudulently conveyed to NECF an exclusive license until May 2017 for the intellectual property of VCF in order to transfer all valuable assets out of VCF, a corporation controlled by shareholders, including plaintiff, and into NECF, which is managed by a single manager, namely Defendant Thomson.  The Defendants covered up this scheme through a course of fraudulent misrepresentations and withholding of information in order to prevent the Plaintiff from learning that the business objectives and purposes of the Defendants were no longer to produce a return to the investors of VCF, but to use VCF as a tax shelter for its shareholders and to allow Thomson to continue to earn a high salary, regardless of the performance of the companies.

5.      Plaintiff believes such fraudulent schemes were set in motion and maintained in an intentional effort to misguide and misdirect the Plaintiff in particular.  From about 2002, the Plaintiff was VCF's only outstanding shareholder who Defendant VCF and Thomson singled out and treated differently.  Upon VCF's failure to repay a short term loan of $25,000 from the Plaintiff as agreed, and upon learning that VCF and Thomson were involved in multiple lawsuits with lenders, merchants, and former shareholders, Plaintiff began to question the authority and actions of VCF and Thomson.  Since then, Defendants have wrongfully isolated and withheld information from the Plaintiff in order to carry out their plan to misappropriate the assets of VCF and found NECF.  Plaintiff believes he was and is the only shareholder of VCF who was unaware of the Defendants' plan and has therefore sustained damages in a manner that is unique

and different from that which any other shareholder of Defendant VCF has sustained. Defendants' failure to properly communicate, update and advise plaintiff about the business affairs of VCF denied plaintiff the opportunity to determine whether to sell and/or relinquish his shares in Defendant VCF.  But for VCF's and Thomson's systemic fraudulent misrepresentations, misappropriations,  omissions, and conveyances, which continue to this day, the Plaintiff would have sold and/or recouped value from the aforementioned shares of common stock in VCF.

6.     The second set of claims (Counts Two & Three) assert claims against the Defendants for violations of  Vermont's Business Corporation Law and common-law accounting duties owed to shareholders of corporations by the corporation and its officers.  Plaintiff seeks an accounting from each of the defendants.

7.     By reason of the foregoing, the Plaintiff has suffered financial loss and brings this action to recover compensatory and punitive damages, attorneys' fees, costs, disbursements and an accounting.

## I.     JURISDICTION AND VENUE

8.     The jurisdiction of the Court is invoked pursuant to 26 U.S.C. §1331 and Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5(b-c).

9.     The Court has supplemental jurisdiction over the Plaintiff's Vermont common law and statutory claims pursuant to 28 U.S.C. §1367, because such claims are related to the claims in this action which invoke this Court's original jurisdiction and arise out of the same set of facts, and they form part of the same case or controversy under Article III of the United States Constitution.

10.     Venue is proper under 28 U.S.C. §1391(b) because all of the defendants are deemed residents of the State of Vermont within the geographical coverage of the United States District Court for the District of Vermont, and the acts and/or omissions giving rise to the claims herein alleged took place within the District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone, and electronic-mail communications.

## II.     PARTIES

12.     Plaintiff, Charles C. Freihofer III is an individual who resides in the Town of Queensbury, New York.

13.     Defendant Vermont Country Foods, Inc. ("VCF") is an active domestic for-profit corporation incorporated under the laws of the State of Vermont on or about March 7, 1994, with its headquarters located at 135 Cody Road, Landgrove, Vermont 05148.

14.     Defendant New England Country Foods, LLC ("NECF") is a limited liability company organized and existing under and by virtue of the laws of the State of Vermont with a principal place of business at 135 Cody Road, Landgrove, Vermont 05148.

15.     Upon information and belief, Defendant Peter Thomson ("Thomson") is the President of Defendant Vermont Country Foods, Inc., and resides at 135 Cody Road, Landgrove, Vermont 05148.

## III.     FACTUAL BACKGROUND

History of the Plaintiff's Initial Involvement with Vermont Country Foods

16.     Upon information and belief, at some point prior to 1994, Thomson founded VCF.

4

17.     Upon information and belief, Thomson founded VCF to establish and develop a profitable company that would generate a positive return on investment and/or pay dividends to its investors.

18.     On or about March 3, 1994, Thomson incorporated VCF and filed a certificate of Incorporation with the Vermont Secretary of State.

19.     VCF was organized in Vermont to manufacture, process, purchase, sell and generally trade and deal in and with goods, foods, commodities, wares, and merchandise of every kind, especially foods in the packaged food industry including gravies, sauces, and soups, and which would generate a positive return on investment and/or pay dividends to its investors.

20.     At the time of its incorporation, VCF's Board of Directors was comprised of three individuals, one of which was Defendant Thomson.

21.     Upon information and belief, after Thomson incorporated VCF, he successfully recruited several other individual investors, including Plaintiff's cousin, Albert Freihofer, to invest in and/or loan money to VCF.

22.     Upon information and belief, in addition to investing and/or lending money to Defendant VCF, Albert Freihofer also sat on VCF's Board of Directors and was employed by VCF.

23.     After successfully recruiting Albert Freihofer, Albert Freihofer introduced VCF to the Plaintiff.

24.     In about 1995, the Defendants began soliciting from plaintiff investments in and capital loans to VCF.

25.     When soliciting investments and loans from the Plaintiff, the Defendants represented VCF to be a strong investment opportunity, with expectations for high returns and dividends.

26.     From about 1995 through 1999, the Plaintiff invested approximately $227,400.00 in exchange for approximately 73,109.93 shares of VCF common stock.

27.     After first investing in VCF in or about 1995, the Plaintiff was appointed to VCF's Board of Directors.

28.     In addition to investing in VCF, the Plaintiff loaned a total of approximately $75,000.00 to VCF from about 1995 through 2001.

29.     Upon information and belief, as of December 31, 2001, the accumulated interest on Plaintiff's loans to VCF totaled approximately $13,791.14.

Vermont County Food's Financial Struggles

30.     From 1994 through 2002, Thomson semi-regularly distributed annual operating reports and/or annual financial reports and/or projection statements to the Board of Directors of VCF.

31.     According to said operating reports and/or annual financial reports and/or projection statements, VCF was experiencing financial struggles due to, among other things, undercapitalization, poor sales figures, and inability to meet customer demand.

32.     Upon information and belief, from 1994 through at least 2002, VCF never once paid a dividend to one of its shareholders.

33.     Upon information and belief, from 1994 through at least 2002, while semi-regularly detailing VCF's financial struggles of VCF in the annual operating reports and/or annual financial statements distributed to the Board of Directors, Thomson consistently sought

from VCF's investors additional influxes of capital investment in the form of increased equity positions or capital loans.

34.     In or about late 2001, Thomson introduced a resolution to VCF's Board of Directors that, if passed, would convert all debts in the form of capital loans owed by VCF to the shareholders and/or other lenders of VCF, at that time, into equity shares of VCF.

35.     On or about December 29, 2001, the Plaintiff agreed to convert all debts to equity and increase VCF's shares of capital stock to facilitate the conversion.

36.     Upon information and belief, the aforementioned resolution introduced by Thomson passed on or about December 31, 2001.

37.     After the aforementioned resolution passed, and all debts in the form of capital loans owed by VCF to the shareholders, at that time, were converted into equity shares of VCF, the Plaintiff's total number of shares of common voting stock in VCF climbed to approximately 96,787.57, and his total investment in VCF stood at some $291,191.14.

38.     Soon after passage of the aforementioned resolution, Thomson immediately began a new capital loan campaign.

39.     On January 31, 2002, Thomson forwarded to the Plaintiff an email he had sent earlier that day to Blanche Goldenberg, then a fellow shareholder of VCF, with a carbon copy to Albert Freihofer.  The email stated as follows:

> Blanch –
>
> Saw Al for dinner Monday and he reports Loomis continues to be served oh so well by your leadership ... capital campaign in the midst of the current economic travails – not easy.  Good work!
>
> Speaking, not surprisingly, of 'not easy', we are down to the very short strokes here: close enough to see our way clear to get to the new Rochester manufacturing facility ... plus a sale of the private

label franchises … plus sale of the remaining equipment and facility.

If we can get through the last of these transition steps, the opportunity for all of us to recoup what, to date, has been a very disappointing investment is significant.  Projections for 2002, based on sales rates experienced in early Fall before the "wheels came off" at the South Carolina contract manufacturer, indicate sales of +$14,000,000, EBITDA +1.2mm, PreTax Income of +$1.0mm.  This assumes just under 10,000 stores … as you may recall, we had 4,400 before we were forced to contract to save some distribution.  The first cut at 2003 is more dramatic: 14,400 stores, sales of +$20mm, PreTax Income at +$4mm.  Again, all these projections are based on the actual sales rates per store we experienced last Fall without any advertising or marketing support.

As you know, our Plan is clearly to sell this brand sometime in 2003 or 2004.  As a "marker", food processors are currently trading for 1.53 times sales … General Mills who now owns Progresso is, I think, the most likely candidate: they trade for 1.97 times sales.

These next 2-3 weeks are critical.

The risk is obvious to all of us: collectively, we have +$5.2mm in this thing not counting debt repaid … the first (private label) model has not worked … the transition to a logical branded model with clear, significant potential has been nothing short of a nightmare for us and me in particular … ironically, the end game will largely be decided over these next 2-3 weeks.

You currently have $321,993.43 in this (including accrued interest converted to equity) … your current equity position is 4.04% … participation of +$40,000 returns you to the 4.5% range.

You and two other major shareholders have not yet participated … if I can get the three of you to participate, we get through these next 2-3 weeks and get to Cantisano in Rochester and we are then off to the races … if not, we will need, in all likelihood, to shut this down. So close …

Anything you can do will, of course, be most appreciated.  If you are not able to participate, I and we will understand …

Thanks for your consideration of this plea …

And again, great work on the Loomis challenges and opportunities!

Peter

40.     In addition to forwarding the aforementioned email to the Plaintiff, Thomson

wrote to the Plaintiff, and stated:

> Chris –
>
> As you can see from below, we are in "this is it" mode here.
>
> You currently have $291,191.14 invested, including accrued interest converted into equity resulting in an equity position of 4.55%. Participation of +$50,000 brings you back to the 5.1% range.
>
> We are so damn close ... and yet if we cannot get these additional funds done, we will, in all probability, have to shut this down. Clarex/Bob Ashton/Frank Weideman have (stunningly) come back to me and asked for 2002 and 2003 projections on the way to participating (note: no commitments yet from them ... just a willingness to participate "subject to" review of 2002, 2003 ... I detailed summary numbers below in my e-mail to Blanche).
>
> The next 2 weeks are "game, set, match" ... anything you can do would be most appreciated.
>
> I know: it isn't Krispy Kreme but then it isn't Enron either ... and it could be either ... actually, it could be Krispy Kreme on steroids (yuck, what a disgusting vision that is: KK doughnuts laced with steroids ...).
>
> So, last point and this one is from George: "why did GOD create alcohol?" ........................ "So the Irish would not rule the world!".
>
> Give me a call so we can chat.
>
> THANKS!
>
> Peter

41.     As is evidenced by the above referenced emails, at a certain point in time VCF's

stock share price was devalued by Defendants.

42.     Said devaluation was carried out without notice or information provided to the Plaintiff.

43.     Based on the above representations made by Thomson, the Plaintiff agreed in about late February 2002 to loan VCF an additional $25,000 which was personally guaranteed by Thomson.

44.     On or about February 15, 2002, Plaintiff enclosed a personal check for $25,000, made payable to VCF in a letter to Thomson stating as follows: "Following up on our recent conversation, enclosed find my check #5892 for $25,000.00. Per our conversation, this money represents an interest free loan to Vermont Country Foods which will be paid back to me on, or before, 15 April 2002."

45.     On or about February 20, 2002, Defendant Thomson, confirmed acceptance of the Plaintiff's loan through an email to the Plaintiff which stated the following

> Chris – Thank you, sir … you were on my list to track down today and as per usual, you needed no 'feeder bar hit'. The executed document is back in the mail to you today. I will be sending out an update to the Board before the week is out … still struggling but we are sooooo [sic] close to getting out of this hole. Your loan is a big help …

46.     VCF failed to repay the aforementioned loaned monies to the Plaintiff as agreed, despite Plaintiff's several demands, and has never repaid the Plaintiff.

47.     On or about April 19, 2002, the Plaintiff notified Thomson via letter that the Plaintiff resigned from VCF's Board of Directors.

Plaintiff Begins to Challenge Thomson and VCF

48.     Upon information and belief, since its inception, Thomson and VCF have consistently failed to follow VCF's bylaws and Vermont Business Corporations law with regard

to holding annual shareholder meetings, calling for votes on resolutions, and distributing required information to the shareholders of VCF.

49.     Upon information and belief, after the Plaintiff's initial investment in VCF in or about 1995, he was consistently outspoken and insistent that Thomson and VCF adhere to VCF's bylaws and follow Vermont Business Corporations Law.

50.     Upon information and belief, any shareholder meetings that were held were due to the pressure exerted and requests made by the Plaintiff.

51.     Upon information and belief, after the Plaintiff resigned from Defendant VCF's Board of Directors in April 2002, the Defendants stopped including the Plaintiff in any communications regarding the financial health of VCF or business decisions or actions made by VCF, notwithstanding plaintiff's substantial share holdings.

52.     Upon information and belief, after the Plaintiff resigned from VCF's Board of Directors in April 2002, the Defendants never again held another shareholder's meeting.

53.     Upon information and belief, after the Plaintiff resigned from VCF's Board of Directors in April 2002, the Defendants stopped sending Plaintiff annual operating reports and/or annual financial reports and/or projection statements

54.     Having not received any communications regarding the financial health or business affairs of VCF, and having not been invited to a single annual shareholder meeting, and having not been provided with annual operating reports and/or annual financial reports and/or projection statements, the Plaintiff began to inquire into the Defendants' actions and business decisions with regard to VCF's outstanding liabilities.

55.     The Plaintiff also expressed to Thomson his desire to be repaid the monies owed him by VCF and voiced concern regarding Thomson's seemingly manipulative and coercive acts

to get the Plaintiff to loan additional VCF monies with no apparent intention of ever paying the Plaintiff back.

56.     From 2002 through 2006, the Defendants attempted to convince Plaintiff that the Defendants were working hard and in the best interests of VCF putting the interests of the shareholders before their own interests.

57.     Further, from 2002 through 2006, the Defendants criticized the Plaintiff's inquiries and demands and alienated the Plaintiff further, in an attempt to convince the Plaintiff that his concerns were unjustified and improper.

Lawsuits, Creation of New England County Foods, and Inquiries by the Plaintiff

58.     Upon information and belief, at about the same time the Defendants failed to timely repay the aforementioned $25,000 loan, Plaintiff began to probe further into Defendant Thomson's actions and business decisions with regard to Defendant VCF's outstanding liabilities and discovered that defendants Thomson and VCF, and VCF's Board of Directors were under threat of suit or had been sued by creditors, lenders, vendors, and current and/or former shareholders of Defendant VCF.

59.     Unbeknownst to the Plaintiff, in late 2001 or early 2002, the Defendants began expressing to certain members of VCF's Board of Directors that the Defendants were considering establishing the entity New England Country Foods LLC.

60.     Upon information and belief, in or about late 2005 or early 2006, Defendant Thomson, Defendant VCF, Defendant VCF's Board of Directors, and the Plaintiff were sued in an action against the shareholders, officers, and directors of VCF, by a judgment creditor of Defendant VCF.

12

61.     Defendant NECF was named as a defendant in the aforementioned lawsuit, in which it was alleged that the Plaintiff was a member of Defendant NECF.

62.     Prior to the aforementioned lawsuit, plaintiff was unaware that he was potentially a member of NECF and was unable to determine the veracity of the aforementioned lawsuit and allegations therein.

63.     Plaintiff attempted to further investigate the aforementioned lawsuit, and the existence of NECF and the Plaintiff's potential ownership stake in NECF.

64.     In February 2009, after several attempts by Plaintiff and his legal counsel to obtain information, the Plaintiff received a letter from the Defendant Thomson dated February 13, 2009, which stated:

> This letter forwards the various materials requested regarding Vermont Country Foods, Inc. ("VCF") as well as a discussion of certain aspects of the operations of VCF.
>
> Current Operations:
> As you are aware, since 2005, VCF has operated as a "holding company" with its principal assets being its intellectual property (formulae, existing private label franchises) and its net operating loss carry forward (:NOL") which stands at approximately $6.2mm. These assets are offset by its liabilities to its trade creditors. These trade creditors are the subject of a three year Workout Plan which is not in its final year of execution; at the conclusion of this Workout Plan, as a condition of the Workout Plan, VCF will receive a full release from these same trade creditors. In order to maintain VCF's existing private label franchises, VCF entered into an exclusive Licensing Agreement with New England Country Foods LLS ("NECF"); this Licensing Agreement terminates on 5/17/17.
>
> Document Request:
> Attached is a copy of the VCF By-Laws, multiple copies of which have been distributed to you previously. There have been no changes to these By-Laws during your time as a VCF shareholder. Several elements of these By-Laws are germane to the thrust of your inquiry.

13

- It has not been my custom to maintain a history of Director and Shareholder Lists. Attached are two lists from two different dates within the time period you identified.
- The By-Laws call for an Annual Shareholder Meeting in September of each year. As you are aware, we have traditionally been flexible as to when the actual Annual Meeting to occur. As you are aware, considerable communications occurred among the shareholders during litigation battle with SoPakCo beginning in 2002 and reaching a denouement in the 2005-2006 period, including various face-to-face meetings in which you participated. The consensus was no additional Meetings were required, nor requested.
- Per the By-Laws, "special meetings" may be called by (a) a majority of Directors, (b) the President or (c) a series of shareholders who combined, vote more than 25% of the total shares outstanding. Shares are voted "1 vote per share". Meeting quorums require a simple majority of all shares outstanding be "present" (directly, by proxy or in writing) for any "special" or shareholder meeting. No special meetings have ever been called, before or during the period of time you have identified.
- Throughout these By-Laws, you will see a consistent theme of votes may be cast in person or by proxy or in writing. For instance, "… the meeting and the vote of shareholders may be dispensed with, if (shareholders) … shall consent in writing …" Consequently, VCF's modus operandi has evolved to one heavily dependent on written communications with infrequent face-to-face meetings.
- The make-up of the Board of Directors (a) is as is detailed in the By-Laws, (b) is as has been constituted consistently over time, i.e. each new shareholder has been asked to join the Board and, as is our practice, has not been asked to stand for re-election and (c) reflects the resignation of certain shareholders at various times including most recent
- Per the By-Laws, no notice is required of a Board Meeting. The last forma, face-to-face Board Meeting of VCF was held on 4/3-4/05 in New York, New York.
- Annual Reports are filed with the State of Vermont at the conclusion of the calendar year. Attached are copies of the respective reports for 2007 and 2008. As you may know, to remain in "good standing", these need to be filled each year, i.e. for 2007 to be filed successfully, 2006 needed to be files, etc.. These are the last two, easily accessible reports … which, of course, provide no information except the basics. If, in fact, you would like to see 2003, 2004, 2005, and 2006, please let me know.

14

- Financial statements for 2005, 2006, and 2007 are attached. The statements for 2003 and 2004 have been delivered to you previously. We can track those down if you insist, but will need additional time. The statements for 2008 are still being prepared.

*** 

Note: for understandable reasons, I have not included the many pieces of communications between the VCF Board of Directors, the shareholders of VCF and myself surrounding the litigation between the members of VCF and SoPakCo during the 2003-2008 time period.

65.     Thomson admits that he failed to maintain a history of Director and Shareholder lists.

66.     Thomson attached the following documents to the aforementioned letter: (1) a copy of Defendant VCF's By-Laws; (2) Annual Reports filed with the State of Vermont for calendar years 2007 and 2008; (3) Financial Statements from calendar years 2003, 2004, 2005 and 2006; (4) an update on Defendant VCF's alleged ownership positions as of August 29, 2004; (5) an email chain between directors of Defendant VCF regarding a conference call from September 7, 2004; (6) Minutes of a Defendant VCF Board of Directors meeting from May 10, 2005; (7) an update on Vermont Country Soup from September 3, 2005; (8) a report to the Defendant VCF Board of Directors regarding the SO-PAK-CO litigation which Defendant VCF was involved in, from October 17, 2005; (8) an Affidavit for Lost, Stolen, Destroyed Stock Certificated for the Plaintiff, dated November 2006; (9) a "housekeeping' letter to Defendant VCF shareholders from December 22, 2006; (10) an "update" letter to Defendant VCF shareholders from April 22, 2007; and (11) a settlement offer from UPS Business Capital from May 7, 2007.

67.     Contrary to the assertions contained in Thomson's February 13, 2009 letter, none of the aforementioned documents had been previously received by the Plaintiff.

68.     Upon information and belief and for reasons unbeknownst to the Plaintiff, Thomson and VCF began, in or about August 2004, exploring the idea of "reorganizing" Defendant VCF into two corporations: Vermont Country Foods, Inc., and New England County Foods, Inc.

69.     Upon information and belief, in or about August 2004, Thomson and VCF also began exploring the idea of entering into a licensing agreement between NECF and VCF.

70.     Upon information and belief, in a letter from Thomson, dated August 29, 2004, which was allegedly sent to VCF's Board of Directors, but not to  Plaintiff, Thomson stated the following:

> In the interest of being prepared, if we are left with the murky "escrow" option, I believe we should implement a plan whereby we:
> - Reorganize the company into two entities: Vermont Country Foods, Inc. and New England Country Foods, Inc. ("NECF"),
> - Seek bankruptcy protection under Chapter 11 for VCF,
> - Have NECF enter into a licensing agreement with VCF to pursue the branded soup opportunity and provide management services to VCF**[sic],
> - Have VCF retain ownership of the Vermont Country Soup intellectual property (trademark, formulae, manufacturing processes and procedures), the private label franchisees, the Net Operating Loss carry forward, the remaining liabilities and the SPC/UNAKA lawsuit,
> - Have NECF provide essentially all management functions for VCF on a fee basis.  Moving forward

71.     Contrary to Thomson's assertions in the aforementioned letter, prior to Defendant Thomson's letter to the Plaintiff in February 2009 Plaintiff was unaware of: the existence of NECF; Plaintiff's alleged ownership interest in NECF; or the existence of an exclusive

intellectual property licensing agreement between VCF and NECF that was to run until May 17, 2017.

72.      Furthermore, Plaintiff had never received any of the communications or records from 2003 and 2004 that Thomson claimed that the Plaintiff had received.

73.      Since the aforementioned letter from Thomson, the Plaintiff has not received a single other communication from the Defendants, nor has the Plaintiff received annual operating reports and/or annual financial reports and/or projection statements from the Defendants.

74.      Thomson's intention for Defendant NECF to "provide essentially all management functions for [Defendant VCF] on a fee basis" further evidences a scheme to defraud the Plaintiff.

75.      Thomson sought not only did to inappropriately transfer all power out of VCF to NECF, which was to be solely managed by Thomson, but also to further establish an additional profiteering scheme for himself by charging Defendant NECF a fee for the provision of Defendant Thomson's management services, all to the detriment of plaintiff.

76.      On or about December 9, 2016, the Plaintiff, through its counsel, Cooper Erving & Savage LLP, sent a letter addressed to  Thomson at VCF's  headquarters, stating  the following:

> Cooper Erving & Savage LLP has been retained by Charles C. Freihofer, III, (Chris Freihofer), to represent Mr. Freihofer with regard to his rights and duties as a shareholder and/or creditor of Vermont Country Foods, LLC, and/or New England Country Foods, LLC ("the corporations"). On behalf of Mr. Freihofer, we respectfully request that Vermont Country Foods, LLC, and New England Country Foods, LLC, make available to us within the next thirty (30) days the following information and materials that Mr. Freihofer is entitled to review:

17

1. Copies of annual federal and state tax filings submitted on behalf of each of the corporations dating back to each corporation's inception;

2. Copies of annual audited financial statements prepared for each of the corporations dating back to each corporation's inception;

3. Copies of annual financial reports prepared for each of the corporations and/or distributed to the board of directors and/or the shareholders of the corporations dating back to each corporation's inception;

4. Copies of annual operating plans for each of the corporations and/or distributed to the board of directors and/or the shareholders of the corporations dating back to each corporation's inception;

5. Documents and/or spreadsheets maintained by the corporations detailing the historical and present day equity positions of all shareholders in the corporations dating back to each corporation's inception;

6. Documents and/or spreadsheets maintained by the corporations detailing the historical and present day loan contributions to the corporations by the shareholders, as well as outstanding debt obligations of the corporations to the shareholders, dating back to each corporation's inception;

7. Copies of all resolutions passed by the board of directors of the corporations pertaining to the creation of classes of shares in the corporations dating back to each corporation's inception;

8. Copies of all written communications on behalf of the corporations to the shareholders of the corporations dating back to each corporation's inception; and

9. Copies of the minutes of all shareholders' meetings and records of actions taken without a meeting for the corporations dating back to each corporation's inception.

Alternatively, instead of making such available to us for our inspection, if you so wish, you may mail copies of the requested documents and materials to our office located at 39 North Pearl Street, 4th Floor, Albany, New York 12207, addressed to Cooper Erving & Savage LLP. Please inform us of any copying and mailing charges associated with doing so.

If any of the above requested documents and materials are unavailable, do not exist, or you object to providing us with such, we respectfully request that you inform us of the reason why such requested materials have not been provided to us or made available so that we may follow up with you. Should you have any questions or concerns, please do not hesitate to contact us. We

look forward to hearing back from you and we appreciate your anticipated cooperation.

77.     The Defendants have never responded to said December 9, 2016 letter.

Mischaracterizations; Omissions; Fraudulent Acts, Practices, and Courses of Business

78.     Upon information and belief, several years of unsuccessful growth, poor performance; lack of return on investment to its shareholders; and multiple lawsuits from creditors and lenders, vendors, and current and/or former shareholders of VCF, prompted Thomson and VCF, in or about 2001 or 2002, to realign VCF's business goals from operating as a for-profit corporation whose objective was to create profits and returns to its investors, to operating as a tax shelter run by Thomson, who would receive full-time, high paying employment in return.

79.     Upon information and belief, at the same time VCF's business objectives were being realigned, the Plaintiff was demanding that Defendants follow VCF's bylaws and comply with Vermont Business Corporation Law.

80.     Upon information and belief, Defendants became concerned over Plaintiff's inquisitiveness and demands and feared Plaintiff would not agree with Defendant VCF's realigned business goals and purposes.

81.     Upon information and belief, although the Plaintiff was informed by the Defendants in 2001 that the purpose for converting all debts in the form of capital loans from VCF's shareholders and/or other lenders into equity shares of VCF was to allow the Defendants to minimize liabilities, Thomson's true motive was to eliminate and/or greatly limit the Plaintiff's ability to inquire and seek repayment his capital loans to VCF, while Defendants established NECF.

82.     Upon information and belief, Defendants' further motive in seeking conversion of capital loan debts owed to Plaintiff, other shareholders and or other lenders, was to settle or fund the defense of multiple lawsuits brought against VCF by creditors and lenders, vendors, and current and/or former shareholders.

83.     Upon information and belief, Thomson intentionally mischaracterized the Defendant's need for a capital loan from the Plaintiff in 2002, and omitted the fact that the loan was actually to fund buyouts of shareholders and pay creditors and lenders who were threatening lawsuits.

84.     Upon information and belief, as the Plaintiff contributed a capital loan to VCF after the loan to equity conversion had taken place, the Defendants intended to limit and/or eliminate the Plaintiff's powers of inquisition and claims to be refunded on the capital loans by intentionally mischaracterizing and omitting several key facts regarding the Defendants newly determined business goals and purposes.

85.     Upon information and belief, after the Defendants failed to repay the Plaintiff, and despite the Defendants tactics to subdue the Plaintiff's demands, the Defendants feared in particular that the Plaintiff could uproot the Defendants' new plan and business goals for Defendant VCF.

86.     Upon information and belief, at or about the time Plaintiff resigned from Defendant VCF's Board of Directors, the Defendants began establishing NECF and withholding from Plaintiff VCF's annual operating reports and/or annual financial reports and/or projection statements.

87.     Upon information and belief, the Defendants mischaracterized that the reasoning for establishing NECF was to avoid penalties from the State of Vermont with regard to

regulations for companies whose names contained the proper noun "Vermont", and in order to avoid bankruptcy.

88.     Upon information and belief, the Defendants mischaracterized the reasoning for establishing Defendant NECF in the communications to Defendant VCF's Board of Directors in order to prevent the Plaintiff from any further inquiry should the Plaintiff ever learn of Defendant NECF's existence.

89.     Upon information and belief, in or about 2005, Thomson proposed a resolution to VCF's Board of Directors for the establishment of NECF, whereby the shareholders of VCF would all be awarded ownership percentages in NECF in proportion to the respective shareholders' equity positions in VCF.

90.     Upon information and belief, Thomson also proposed that NECF be formed as a single member managed limited liability corporation.

91.     Thomson and VCF selected Thomson to act as the single member-manager of Defendant NECF, without providing any notice to the Plaintiff.

92.      Thomson represented that establishing Defendant NECF was required, among other reasons, because of a new Vermont law restricting companies whose corporate names contained the word "Vermont" to those which actually produced a product in Vermont.

93.     Defendant Thomson's representations were false, and he knew they were false at the time he made them in order to deceive and conceal his true intention to transfer all power and value out of VCF and away from Plaintiff, and into NECF.

94.     Defendants have intentionally withheld from Plaintiff all information regarding NECF's revenues and profits in order to perpetuate Thomson's fraudulent scheme to continue to fund his own salary without ever producing a return on Plaintiff's investment.

21

95.     Upon information and belief, Thomson and VCF 's true purpose for establishing

NECF was to, in essence, transfer all valuable assets out of VCF, which was controlled by

Plaintiff and other shareholders, and into NECF, which is controlled by Thomson, the single

member manager.

Plaintiff's Lost Sales and Opportunities

96.     Upon information and belief, pursuant to VCF's bylaws, the Plaintiff's shares of

common stock are entitled to unlimited voting rights on decisions of VCF, and the shares are

entitled to receive the value of the net assets of the corporation upon dissolution.

97.     Further, upon information and belief, pursuant to Defendant VCF's bylaws:

> No Shareholder shall without prior written consent of all of the
> other shareholders at any time during the continuance of the
> corporation give, sell, assign, transfer, encumber or otherwise
> distribute or dispose of all or any part of his shares of the
> corporation unless and until he shall comply with the following:
>
> (a) First offering to sell all of his shares in the corporation to the
> corporation and/or to the other shareholders;
>
> (b) The corporation shall have the first option to purchase all of
> said shares;
>
> (c) Should the corporation fail or refuse to purchase, then the other
> shareholders shall have the option to purchase all of such
> unpurchased shares;
>
> (d) If either the corporation or the remaining shareholders fail to
> purchase or refuse to purchase, then the selling shareholder shall
> be free to sell, assign, transfer or otherwise dispose of his shares of
> the corporation.

98.     Since Plaintiff invested in and became a shareholder of VCF, and up to

Thomson's failure to respond to the aforementioned December 9, 2016 letter-request from

Plaintiff's counsel, Plaintiff continued to believe that Defendants' intention, based on Defendants

22

representations and omissions, was to establish and develop a profitable company that would generate a positive return on investment and/or pay dividends to its investors.

99.     In reliance on Defendants representations and omissions, the Plaintiff has held onto his shares of VCF and forsook his right to sell or relinquish his shares pursuant to VCF's bylaws.

100.    By foregoing his right to sell or relinquish his shares pursuant to VCF's bylaws, the Plaintiff has suffered negative tax consequences in the form of greater tax liabilities that could have been off-set by losses.

101.    By foregoing his right to sell or relinquish his shares pursuant to VCF's bylaws, the Plaintiff has suffered from the loss of any consideration that he may have received in exchange for the sale of such shares.

102.    Furthermore, given Thomson's misrepresentations with regard to the exclusive licensing agreement, his failure to respond to the aforementioned December 9, 2016 letter request form plaintiff's counsel, and the likelihood that the exclusive licensing agreement which ran until May 17, 2017, has either been extended or replaced, the Plaintiff has forsaken the opportunity to sell his shares of stock.

## IV.     CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
**(Fraud under the Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5(b-c): On-Going Fraudulent Scheme)**

103.    The Plaintiff repeats and realleges each and every claim, statement and/or allegation contained in Paragraphs "1" through "102" hereof as if fully set forth herein.

104.    The Securities Exchange Act of 1934, § 10(b), codified as 15 U.S.C.A. § 78j(b) provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national exchange –

\*\*\*

(b)To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

105.    Rule 10b-5 promulgated by the Securities Exchange Commission and codified as

17 C.F.R. § 240.10b–5(b-c) provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commer4ce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

106.    The Plaintiff has consistently relied on the mischaracterizations and omissions of

the Defendants since he took ownership of shares in VCF.

107.    Defendants' many    misrepresentations and withholding of information from

Plaintiff over a period of years are evidence of the Defendants' on-going scheme to defraud the

Plaintiff and conceal their actual intentions with respect to the purpose of the formation of

NECF, which is to transfer ownership, power and management away from VCF and into NECF.

24

108.    Upon information and belief, the exclusive Licensing Agreement allegedly entered into between VCF and NECF was entered into in order to remove all assets of VCF from the Plaintiff's reach and place those assets under Thomson's complete control as the single member-manager of NECF.

109.    Not until Defendants' failure to respond to counsel's December 9, 2016 request for information, documents and records did the Plaintiff realize he had been defrauded into relying on the Defendants' misrepresentations. The Plaintiff relied on each and every one of defendants' misrepresentations and omissions in the belief that VCF's purpose was to generate a positive return on investment and/or pay dividends to its investors, and not simply to act as a tax shelter for its shareholders, and provide Thomson with full-time, high paying employment.

110.    By reason of the foregoing, plaintiff is entitled to compensatory and punitive damages, and attorneys' fees, costs and disbarments.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Right to Examine Records, 11A V.S.A. § 16.02)

111.    The Plaintiff repeats and realleges each and every claim, statement and/or allegation contained in Paragraphs "1" through "110" hereof as if fully set forth herein.

112.    The state of Vermont's Business Corporation law regarding records and reports, codified as 11A V.S.A. §16.02(a), provides that:

> (a) A shareholder of a corporation is entitled to inspect and copy, during regular business hours at the corporation's principal office, or, if not in this State, the registered office, any of the records of the corporation described in 16.01(a) of this title if the shareholder gives written notice of the shareholder's demand at least five business days before the date on which the shareholder wishes to inspect and copy. A shareholder of a close corporation as defined in section 20.02 of this title is also entitled to inspect and copy, pursuant to this subsection, such corporation's record of shareholders.

25

113.    The state of Vermont's Business Corporation law regarding what records and

reports are covered by the aforementioned statute, codified as 11A V.S.A. §16.01(a), provides

that:

> A corporation shall keep as permanent records minutes of all
> meetings of its shareholders and board of directors, a record of all
> actions taken by the shareholders or board of directors without a
> meeting, and records of all actions taken by a committee of the
> board of directors in place of the board of directors on behalf of the
> corporation.

114.    The state of Vermont's Business Corporation law regarding what other records

and reports are to be maintained by a corporation, codified as 11A V.S.A. §16.01(b-c), provides

that:

> (b) A corporation shall maintain appropriate accounting records.
>
> (c) A corporation or its agent shall maintain a record of its
> shareholders, in a form that permits preparation of a list of the
> names and addresses of all shareholders, in alphabetical order by
> class of shares showing the number and class of shares held by
> each.

115.    The state of Vermont's Business Corporation law regarding records and reports,

codified as 11A V.S.A. §16.02(b-d), provides that:

> (b) A shareholder of a corporation is entitled to inspect and copy,
> during regular business hours at a reasonable location specified by
> the corporation, any of the following records of the corporation if
> the shareholder meets the requirements of subsection (c) of this
> section and gives the corporation written notice of his or her
> demand at least five business days before the day on which he or
> she wishes to inspect and copy:
>
> (1) accounting records of the corporation ; and
>
> (2) the record of shareholders.
>
> (c) A shareholder may inspect and copy the records described in
> subsection (b) of this section only if:

26

(1) the shareholder establishes that the shareholder's demand is
made in good faith and for a proper purpose;

(2) the shareholder describes with reasonable particularity the
shareholder's purpose and the records the shareholder desires to
inspect; and

(3) the records are directly connected with the shareholder's
purpose.

(d) The right of inspection granted by this section may not be
abolished or limited by a corporation's article of incorporation or
bylaws.

116.    On December 9, 2016, counsel for the Plaintiff mailed a letter on Plaintiff's

behalf as a shareholder of VCF and NECF to Thomson at VCF headquarters which, among other

things, requested that Mr. Thomson make available to the Plaintiff's counsel (1) copies of annual

federal and state tax filings submitted on behalf of each of Vermont Country Foods, LLC, and/or

New England Country Foods, LLC ("The corporations") dating back to each corporation's

inception; (2) copies of annual audited financial statements prepared for each of the corporations

dating back to each corporation's inception; (3). copies of annual financial reports prepared for

each of the corporations and/or distributed to the board of the directors and/or the shareholders of

the corporations dating back to each corporation's inception; (4) documents and/or spreadsheets

maintained by the corporations detailing the historical and present day equity positions of all

shareholders in the corporations dating back to each corporation's inception; (5) copies of all

resolutions passed by the board of directors of the corporations pertaining to the creation of

classes of shares in the corporations dating back to each corporation's inception; (6) copies of all

written communications on behalf of the corporations to the shareholders of the corporations

dating back to each corporation's inception; and (7) copies of the minutes of all shareholders'

meetings and records of actions taken without a meeting for the corporations dating back to each corporation's inception.

117.    The Defendants have failed to respond to the aforementioned letter, and have failed to make available to the Plaintiff the above requested records and reports.

118.    By reason of Defendants' failure to make the requested records available for inspection and copying, the Defendants have violated the Plaintiff's rights as a shareholder of VCF and/or NECF under Vermont Business Corporation Law.

### AS AND FOR A THIRD CAUSE OF ACTION
#### (Common Law Accounting)

119.    The Plaintiff repeats and realleges each and every claim, statement and/or allegation contained in Paragraphs "1" through "118" hereof as if fully set forth herein.

120.    By reason of the forgoing, Plaintiff is entitled to an accounting and an order compelling Defendants to provide the Plaintiff with the records and documents sought in the aforementioned December 9, 2016 letter request.

### V.    CONCLUSION

**WHEREFORE**, Plaintiff seeks judgment as follows:

      a.  On the first cause of action for compensatory and punitive damages, , attorney's fees, costs and disbursements;

      b.  On the second cause of action for the provision of records and things demanded by Plaintiff for inspection and copying;

      c.  On the third cause of action for an accounting to Plaintiff by each of the Defendants; and

      d.  For such other and further relief as the Court may deem just and proper.

Dated: August 3, 2017
Albany, New York

**COOPER ERVING & SAVAGE LLP**

Christopher P. Flint, Esq.
*Attorneys for the Plaintiff*
39 North Pearl Street
Albany, New York 12207-2797
(518) 449-3900

247494